## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*Cleveland Bakers & Teamsters Health & Welfare Fund, et al. v. Purdue Pharma, L.P., et al.*<br>Case No. 1:18-op-45432-DAP | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

## MEMORANDUM IN SUPPORT
## OF DISTRIBUTORS' MOTION TO DISMISS
## <u>AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................... 2

ARGUMENT ....................................................................................................... 3

I.   THE DERIVATIVE INJURY RULE BARS THE FUNDS' CLAIMS. ............................ 3

II.  THE RICO AND OCPA CLAIMS SHOULD BE DISMISSED. ............................... 6

     A.   The Funds Fail To Allege a Direct Injury................................................ 7

          1.   The RICO Claim ........................................................................... 7

          2.   The OCPA Claim .......................................................................... 8

     B.   The Funds Fail To Allege an Injury to Business or Property. ................ 8

     C.   The Funds Fail To Allege Predicate Acts by Distributors.................... 9

     D.   The Funds' Enterprise Allegations Fail. .............................................. 10

III. THE FUNDS' NUISANCE CLAIMS SHOULD BE DISMISSED................................ 12

IV.  THE FUNDS' NEGLIGENCE CLAIM SHOULD BE DISMISSED............................ 13

     A.   The OPLA Bars the Negligence Claim................................................. 13

     B.   The Complaint Fails To Allege a Duty Owed by Distributors to the Funds. ....... 14

          1.   No private right of action ........................................................ 15

          2.   No common law duty ............................................................... 15

          3.   No breach .................................................................................. 17

V.   THE FUNDS' CLAIMS FAIL FOR ADDITIONAL REASONS. ................................. 18

     A.   The Funds Fail To Plead Causation. .................................................... 18

     B.   The Economic Loss Doctrine Bars the Funds' Claims.......................... 20

VI.  THE FUNDS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED............. 21

VII. THE FUNDS' CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED. ................. 23

CONCLUSION.................................................................................................... 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ..........................................................................11

*Anctil v. Ally Fin., Inc.*,
   998 F. Supp. 2d 127 (S.D.N.Y. 2014), *aff'd in relevant part sub nom. Babb v.*
   *Capitalsource, Inc.*, 855 F. App'x 66 (2d Cir. 2015)...............................................11

*Ark. Carpenters' Health & Welfare Fund v. Philip Morris, Inc.*,
   75 F. Supp. 2d 936 (E.D. Ark. 1999) .....................................................................6

*Bible v. United Student Aid Funds, Inc.*,
   799 F.3d 633 (7th Cir. 2015) ...............................................................................11

*Bonadio v. PHH Mortg. Corp.*,
   No. 12 CV 3421(VB), 2014 WL 522784 (S.D.N.Y. Jan. 31, 2014)......................12

*Boyle v. United States*,
   556 U.S. 938 (2009)...............................................................................................10

*Bradley v. Miller*,
   96 F. Supp. 3d 753 (S.D. Ohio 2015) ...................................................................10

*City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*,
   863 F.3d 474 (6th Cir. 2017) ................................................................................20

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
   615 F.3d 496 (6th Cir. 2010) ................................................................................18

*Foister v. Purdue Pharma, L.P.*,
   295 F. Supp. 2d 693 (E.D. Ky. 2003) .....................................................................5

*Freund v. Purdue Pharma Co.*,
   No. 04-C-611, 2006 WL 482382 (E.D. Wis. Feb. 27, 2006)..................................6

*Hemi Grp., LLC v. City of New York*,
   559 U.S. 1 (2010)................................................................................................7, 8

*Holmes v. Securities Investor Protection Corp.*,
   503 U.S. 258 (1992)..........................................................................7, 8, 18, 19

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris*
   *Inc.*,
   196 F.3d 818 (7th Cir. 1999) ................................................................4, 5, 21, 22

*Jackson v. Sedgwick Claims Mgmt. Servs.*,
   731 F.3d 556 (6th Cir. 2013) (en banc) ................................................................8, 9

*Koenig v. Purdue Pharma Co.*,
   435 F. Supp. 2d 551 (N.D. Tex. 2006) ...................................................................5

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
   191 F.3d 229 (2d Cir. 1999)...............................................................................4, 6

*Labzda v. Purdue Pharma, L.P.*,
   292 F. Supp. 2d 1346 (S.D. Fla. 2003) .............................................................6, 16

*McCauley v. Purdue Pharma L.P.*,
   331 F. Supp. 2d 449 (W.D. Va. 2004) ...................................................................6

*Myers v. United States*,
   17 F.3d 890 (6th Cir. 1994) ................................................................................15

*Nordberg v. Trilegiant Corp.*,
   445 F. Supp. 2d 1082 (N.D. Cal. 2006) ..............................................................12

*Ohio Edison Co. v. Direct Energy Bus., LLC*,
   No. 5:17-cv-746, 2017 WL 3174347 (N.D. Ohio July 26, 2017)..........................21

*Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris Inc.*,
   185 F.3d 957 (9th Cir. 1999) ...............................................................................4

*Perry v. Am. Tobacco Co.*,
   324 F.3d 845 (6th Cir. 2003) ...............................................................................4

*Ray v. Spirit Airlines, Inc.*,
   836 F.3d 1340 (11th Cir. 2016) ..........................................................................11

*Robins v. Global Fitness Holdings, LLC*,
   838 F. Supp. 2d 631 (N.D. Ohio 2012)...............................................................11

*Seafarers Welfare Plan v. Philip Morris*,
   27 F. Supp. 2d 623 (D. Md. 1998).......................................................................22

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*,
   873 F.3d 574 (7th Cir. 2017) ..............................................................................19

*Tex. Carpenters Health Benefit Fund v. Philip Morris Inc.*,
   199 F.3d 788 (5th Cir. 2000) ...............................................................................4

*Tex. Carpenters Health Benefit Fund v. Philip Morris, Inc.*,
   21 F. Supp. 2d 664 (E.D. Tex. 1998), *aff'd*, 199 F.3d 788 (5th Cir. 2000) ...........22

*Timmons v. Purdue Pharma Co.*,
No. 8:04-CV-1479-T-26MAP, 2006 WL 263602 (M.D. Fla. Feb. 2, 2006) ............................5

*United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v.*
*Philip Morris, Inc.*,
223 F.3d 1271 (11th Cir. 2000) ...........................................................................................4

*United States v. Fowler*,
535 F.3d 408 (6th Cir. 2008) .........................................................................................10, 12

## STATE CASES

*Bilicic v. Brake*,
581 N.E.2d 586 (Ohio Ct. App. 1989)..................................................................................20

*Bohme, Inc. v. Sprint Int'l Commc'ns Corp.*,
686 N.E.2d 300 (Ohio Ct. App. 1996)..................................................................................16

*City of Cleveland v. JP Morgan Chase Bank, N.A.*,
No. 98656, 2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ............................................8

*E. States Health & Welfare Fund v. Philip Morris, Inc.*,
188 Misc. 2d 638 (N.Y. Sup. Ct. 2000) ................................................................................4

*Feichtner v. Ohio Dep't of Transp.*,
683 N.E.2d 112 (Ohio Ct. App. 1995)..................................................................................17

*Herakovic v. Catholic Diocese of Cleveland*,
No. 85467, 2005 WL 3007145 (Ohio Ct. App. Nov. 10, 2005) ............................................8

*Kaminer v. Eckerd Corp. of Fla., Inc.*,
966 So. 2d 452 (Fla.. App. 2007)...........................................................................................5

*Kerns v. Hoppe*,
381 P.3d 630, 2012 WL 991651 (Nev. 2012) .......................................................................5

*Maryland v. Philip Morris Inc.*,
No. 96122017, 1997 WL 540913 (Md. Cir. Ct. May 21, 1997)..............................................4

*Miller v. W. Carrollton*,
632 N.E.2d 582 (Ohio Ct. App. 1993).................................................................................13

*Orzel v. Scott Drug Co.*,
537 N.W.2d 208 (Mich. 1995)...............................................................................................5

*Price v. Purdue Pharma Co.*,
920 So. 2d 479 (Miss. 2006) (en banc).................................................................................5

*RWP, Inc. v. Fabrizi Trucking & Paving Co.*,
  No. 87382, 2006 WL 2777159 (Ohio Ct. App. Sept. 28, 2006) .............................................20

*Simpson v. Big Bear Stores Co.*,
  652 N.E.2d 702 (Ohio 1995) .........................................................................................16

*State of São Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*,
  919 A.2d 1116 (Del. 2007) .........................................................................................1, 5

*Thompson v. Argent Mortg. Co. LLC*,
  No. 94613, 2010 WL 3747601 (Ohio Ct. App. Sept. 23, 2010) .............................................13

*Tracy v. Merrell Dow Pharms., Inc.*,
  569 N.E.2d 875 (Ohio 1991) ........................................................................................18

*Volter v. C. Schmidt Co.*,
  598 N.E.2d 35 (Ohio Ct. App. 1991) (per curiam) ......................................................17

*Wallace v. Ohio Dep't of Commerce*,
  773 N.E.2d 1018 (Ohio 2002) ......................................................................................15

*White v. Vrable*,
  No. 98AP-1351, 1999 WL 771053 (Ohio Ct. App. Sept. 30, 1999) .......................................20

## OTHER AUTHORITIES

21 U.S.C. §§ 823, 843(a)(4) .............................................................................................9

Ohio Rev. Code § 2307.71(A)(13) .................................................................................14

Ohio Rev. Code § 2307.71(B) .......................................................................................13

Ohio Rev. Code § 2923.34(A) .......................................................................................10

21 C.F.R. § 1301.74(b) ..................................................................................................14

21 C.F.R. §§ 1303.21-.23 ..............................................................................................11

Ohio Admin. Code 4729-9-16(H) ..................................................................................15

Drug Enf't Admin, *Quota Applications*,
  https://www.deadiversion.usdoj.gov/quotas/quota_apps.htm .................................................11

Defendants AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation (collectively, "Distributors") move to dismiss the Amended Complaint ("Complaint") dated June 18, 2018 filed by Cleveland Bakers and Teamsters Health and Welfare Fund and Pipe Fitters Local Union No. 120 Insurance Fund (collectively, the "Funds" or "Plaintiffs").

## PRELIMINARY STATEMENT

This case constitutes the fifth "wave" of bellwether motion-to-dismiss briefing.  The claims are not new, but the status of Plaintiffs is.  Plaintiffs are a trust fund established to provide health benefits to union employees and an ERISA-governed employee health plan—i.e., they are third-party payors.  Their sole function is to pay the medical costs of their members, who pay premiums to secure that coverage.  The law is clear that insurers (like the Funds) cannot sue in their own names to recover the medical costs they pay on behalf of their members.

Twenty years ago and more, when individual smokers often found it difficult to prevail in personal injury lawsuits against the tobacco manufacturers, third-party payors (including unions and union-sponsored health plans) tried to sue for costs resulting from smoking-related injuries. "*Multitudinous* … *state and federal appellate courts* … *unanimously* invoked the same rationale" to dismiss those cases, "*all holding* that third-party payors or providers of medical services, including … insurers [and] ERISA health plans … have *no cognizable claims* under federal statutory law or state common law to recover medical expenses from the tobacco companies, because the plaintiffs' alleged injuries were entirely derivative of the injuries to the smoker-consumers of the tobacco companies' products."[1]  The law has not changed since.

---

[1]  *State of São Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116, 1125 (Del. 2007).  Unless otherwise noted, this Memorandum adds all emphasis in quotations and omits citations and internal quotation marks.

The terms of an insurer's coverage may give it subrogation rights.  If so, it may sue in the individual member's name to recover for any injuries caused by the defendant's wrongful conduct—but, of course, subject to the defenses that can be asserted against the individual member, including his own wrongful conduct.  Here, the Funds do not purport to assert subrogation rights; instead, they purport to assert claims in their own right.

The Funds present a textbook example of plaintiffs whose claims should be dismissed because they are indirect and derivative.  The Funds did not deal directly with Distributors, and they were not directly affected by anything that Distributors did or did not do.  Any "injury" the Funds suffered was indirect because it resulted from, and was contingent upon, the personal injury suffered by their members.  In seeking recovery of the costs of opioid-related medical care for its insureds—costs the Plaintiffs were contractually obligated to pay—the Funds assert derivative claims that the courts have uniformly rejected.

For this fundamental reason, as well as the additional reasons described below, the Funds' claims fail as a matter of law.

## BACKGROUND[2]

As the Complaint acknowledges, the role of Distributors is limited to the "wholesale distribution" of medications.  Compl. ¶ 79.  Distributors "acquire pharmaceuticals, including opioids, from manufacturers," *id.* ¶ 496, and ship them to pharmacies in response to orders.  Unlike the "Marketing Defendants," (i.e., Manufacturers) who "advertise[]" and "promote[]" prescription

---

[2]  The regulatory backdrop against which this action is set is described in detail in Distributors' *Summit County* brief, which they incorporate by reference herein.  *See* Summit Br., Dkt. 491-1.  Distributors also hereby adopt, as if set forth herein, the arguments made in support of the separate motions to dismiss filed today by the manufacturing defendants and the retail pharmacy defendants.

opioids, *id.* ¶ 35, Distributors do not market prescription drugs to doctors.[3]  And, unlike retail pharmacies, Distributors are not involved in the "dispensing of prescription opioids" to patients based on prescriptions by licensed physicians.  *Id.* ¶ 571.

The vast majority of the Complaint is devoted to detailing a supposed "sophisticated and deceptive marketing strategy" on the part of the Manufacturers, which allegedly made "misrepresentations about the risks and benefits of opioids" in order to "increase sales by convincing doctors to prescribe opioids."  Compl. ¶¶ 11, 141; *see, e.g.*, *id.* ¶¶ 140–463, 711–70, 839–74.  Tellingly, the Funds do not allege that ***Distributors*** made any such misrepresentations to doctors or the public—nor could they.  The Complaint likewise fails to identify a single pharmacy that placed a suspicious order, much less the actual suspicious orders that each Distributor allegedly failed to report.  And the Complaint fails to connect any order with any of the harms that the Funds purportedly suffered.

## ARGUMENT

## I.      THE DERIVATIVE INJURY RULE BARS THE FUNDS' CLAIMS.

Plaintiffs are a health plan and trust fund established by Ohio labor unions to provide health and welfare benefits to their members.  Compl. ¶¶ 28–29.  They claim as injury:

> payments for hospital and/or urgent care emergency department visits and other treatment for opioid misuse, addiction, and/or overdose; payments for emergency department visits for infections related to opioid misuse, addiction, and/or overdose; payments for hospitalizations related to the misuse, addiction and/or overdose of opioids; payments for medicines to treat HIV, hepatitis C and other issues related to the opioid misuse, addiction and/or payments for opioid overdose reversal medication ….

*Id.* ¶ 20.  Because these alleged injuries are wholly derivative of the personal injuries of individual

---

[3]    The Complaint uses the term "Marketing Defendants" to describe entities associated with 7 manufacturers of opioid medications.  Compl. ¶¶ 35–78.  This brief uses the terms "Manufacturers" and "Marketing Defendants" interchangeably.

opioid users, the Funds' claims all fail as a matter of law.

"The usual common law rule is that a health-care provider has no direct cause of action in tort against one who injures the provider's beneficiary, imposing increased costs upon the provider." *United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 (11th Cir. 2000) (citing *Anthony v. Slaid*, 52 Mass. 290, 290–91 (1846)).[4]  Accordingly, federal courts have repeatedly rejected attempts by unions and other third-party payors to recover health care costs in their own name from alleged third-party tortfeasors.[5]

The Seventh Circuit's decision in *Local 734* is instructive.  There, union-sponsored health plans brought suit against tobacco companies seeking compensation for smoking-related healthcare costs.  *See* 196 F.3d at 820–21.  The court began by noting that, "[f]or more than 100 years state and federal courts have adhered to the principle (under both state and federal law) that the victim of a tort is the proper plaintiff, and that insurers or other third-party providers of assistance and medical care to the victim may recover only to the extent their contracts subrogate them to the victim's rights."  *Id.* at 822 (collecting cases).  In *Local 734*, the plaintiff third-party payors "forsw[ore] subrogation because … smokers' suits against cigarette manufacturers usually

---

[4]  *Accord E. States Health & Welfare Fund v. Philip Morris, Inc.*, 188 Misc. 2d 638, 646 (N.Y. Sup. Ct. 2000) ("[F]or more than [a] century, state and federal courts have adopted the theory that the victim of a tort is the appropriate plaintiff and that third-party providers of medical care may recover only pursuant to rights of subrogation."); *Maryland v. Philip Morris Inc.*, No. 96122017, 1997 WL 540913, at *9 (Md. Cir. Ct. May 21, 1997) ("At common law a plaintiff had no right to recover damages from a defendant tortfeasor as a result of the defendant's injuries, harm, or lack of care to a third person….").

[5]  *E.g.*, *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 822 (7th Cir. 1999) (hereinafter, *Local 734*); *accord Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849 (6th Cir. 2003); *Tex. Carpenters Health Benefit Fund v. Philip Morris Inc.*, 199 F.3d 788, 789–90 (5th Cir. 2000); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999); *Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963–64 (9th Cir. 1999).

are unsuccessful." *Id.* But that, the court said, was exactly "why plaintiffs must lose": "A third-party payor has no claim if its insured did not suffer a tort" for which either the insured (directly) or the insurer (through subrogation) can recover. *Id.* at 823; *accord São Paulo*, 919 A.2d at 1123 ("[I]t would be both unfair and unsound policy to allow" third-party payors "to pursue claims on which the[] injured [persons], had they sued directly, might not be entitled to recover.").

Plaintiffs here have declined to bring subrogation claims for the same reasons as the third-party payors in the tobacco litigation. Since the late 1990s, hundreds of individual users have sued opioid manufacturers for personal injury. Distributors are not aware of a single reported case in which a plaintiff survived summary judgment, let alone prevailed at trial. These lawsuits were typically dismissed because: (1) the user obtained opioids **legitimately**, through a prescription from a licensed physician, and the learned intermediary doctrine barred the claim,[6] or (2) the user obtained the opioids **illegitimately**, through theft or deception, for example, and the user's own wrongful conduct barred the claim.[7] Other suits were dismissed because the plaintiffs could not

---

[6]  *See Koenig v. Purdue Pharma Co.*, 435 F. Supp. 2d 551, 555 (N.D. Tex. 2006) (the physician "was aware of the possible addiction risks associated with the [opioid] OxyContin, yet chose to prescribe it anyway"); *Timmons v. Purdue Pharma Co.*, No. 8:04-CV-1479-T-26MAP, 2006 WL 263602, at *4 (M.D. Fla. Feb. 2, 2006) (granting summary judgment because all four of user's prescribing doctors "were independently aware of the risks of addiction"); *Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693, 708 (E.D. Ky. 2003) ("[A]pplication of the learned intermediary defense bars the claims of all plaintiffs to this action."); *Kerns v. Hoppe*, 381 P.3d 630, 2012 WL 991651, at *1 (Nev. 2012) (unpublished table decision) (affirming dismissal of claims against pharmacy based on leaned intermediary doctrine).

[7]  *See Price v. Purdue Pharma Co.,* 920 So. 2d 479, 486 (Miss. 2006) (en banc) (wrongful conduct rule "prevents a plaintiff from suing caregivers, pharmacies, and pharmaceutical companies … for addiction to a controlled substance which he obtained through his own fraud, deception, and subterfuge"); *Kaminer v. Eckerd Corp. of Fla., Inc.*, 966 So. 2d 452, 453 (Fla.. App. 2007) (affirming summary judgment because deceased opioid user obtained prescriptions by theft); *Foister*, 295 F. Supp. 2d at 705 (dismissing claims because plaintiffs procured OxyContin illegally and had to rely on their illegal actions to establish their claims); *Orzel v. Scott Drug Co.*, 537 N.W.2d 208, 217–18 (Mich. 1995) (dismissing widow's claims against pharmaceutical company because her husband fraudulently obtained the prescriptions that led to his death).

show that the defendant's product, as opposed to another manufacturer's opioid medication or an illicit drug, was the cause of his injury, *see, e.g.*, *McCauley v. Purdue Pharma L.P.*, 331 F. Supp. 2d 449, 465 (W.D. Va. 2004); because the plaintiffs intentionally misused opioids by crushing, snorting, or inhaling them, *see, e.g.*, *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346, 1350, 1356 (S.D. Fla. 2003); or because the statute of limitations had run, *see, e.g.*, *Freund v. Purdue Pharma Co.*, No. 04-C-611, 2006 WL 482382, at *7 (E.D. Wis. Feb. 27, 2006).  Against this backdrop, as in the tobacco cases, Plaintiffs do not want to stand in the shoes of the directly-injured users of opioid medications and subject themselves to the defenses that can be asserted against users.

As in the tobacco cases, however, Plaintiffs' claims are derivative:  "Without injury to the individual [opioid users], the Funds would not have incurred any increased costs." *Laborers Local 17*, 191 F.3d at 239; *see also Ark. Carpenters' Health & Welfare Fund v. Philip Morris, Inc.*, 75 F. Supp. 2d 936, 941 (E.D. Ark. 1999) ("Without any injury to smokers, the plaintiff would not have incurred any of the additional, smoking related expenses for which it is now seeking reimbursement.").  If the Funds have subrogation rights, they can sue by naming their members and standing in their shoes to assert the members' claims for personal injury.  But, under established law, the Funds cannot recover in tort for derivative injuries to their members by suing in their own name.  This argument alone is dispositive.

## II.     THE RICO AND OCPA CLAIMS SHOULD BE DISMISSED.

The Funds fail to plead a valid RICO claim against Distributors for at least four separate reasons.  The Funds fail to allege that:  (1) they suffered a "direct" injury by reason of Distributors' alleged conduct; (2) they suffered an injury to their "business or property"; (3) Distributors committed two or more predicate acts; and (4) there exists a valid RICO enterprise that Distributors

directed.  For many of the same reasons, the Funds' claim under Ohio's RICO analogue—the Ohio Corrupt Practices Act ("OCPA")—likewise fails as a matter of law.

### A.      The Funds Fail To Allege a Direct Injury.

The Funds do not plead that Distributors' alleged conduct caused their purported injuries *directly*—nor could they.  Under established precedent, that failure forecloses both its RICO and OCPA claims.  *See* Summit Br., Dkt. 491-1 at Part I.B.

### 1.      The RICO Claim

Under a line of Supreme Court cases that began with *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), a plaintiff must allege that "a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'"  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 268).  This means that a plaintiff must allege a "direct relation between the injury asserted and the injurious conduct alleged."  *Id.*  "A link that is too remote, purely contingent, or indirec[t] is insufficient."  *Id.* (alteration in original).  Theories of causation cannot "***go beyond the first step***."  *Id.* at 10–11.

The Funds do not allege the required "direct causal connection" between their injury and Distributors' alleged predicate acts.  *Id.* at 17–18.  The Funds' alleged injury consists exclusively of "payments" they made for their members' medical care and treatment.  Compl. ¶ 960.  Only if one of Plaintiffs' members first suffered personal injury (i.e., became addicted or overdosed) would the Funds incur any costs.  Thus, at most, it was the member who was directly injured; the Funds' injury is indirect, because it is contingent on the member's injury.[8]  As in *Holmes*, the link

---

[8]    Distributors' conduct cannot be the direct cause of even the members' injury.  Wholesale distributors supply retail pharmacies, where the medication sits on the shelf unless a doctor writes a prescription and the pharmacist fills it.  In the causal chain, both doctor and pharmacist stand between a Distributor and the end user.

between the Funds' payments—which were "purely contingent on the harm suffered by" their opioid-using members—and Distributors' alleged non-reporting of pharmacy orders "is too remote." *See* 503 U.S. at 271.  The Funds' claims impermissibly seek to go "beyond the first step" of causation.  *Hemi*, 559 U.S. at 10.

For substantially the reasons explained in Distributors' *Summit County* brief, the remote and derivative injuries alleged by Plaintiffs fail to satisfy the direct injury requirement applicable to its RICO claims.  *See* Summit Br., Dkt. 491-1 at Part I.B.

### 2. The OCPA Claim

The *Holmes* "direct injury" test described above equally applies to the Funds' OCPA claim. *See, e.g.*, *Herakovic v. Catholic Diocese of Cleveland*, No. 85467, 2005 WL 3007145, at *5 (Ohio Ct. App. Nov. 10, 2005) (holding that because the OCPA "is patterned after the federal RICO law, ***we adopt the same position as that in Holmes***[], ***which requires proof of proximate cause in an OPCA claim***"); *City of Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332, at *5 (Ohio Ct. App. Mar. 21, 2013) (holding that "[t]he same proximate cause requirements"— i.e., "the 'direct relation' test set forth in *Holmes*"—apply to both RICO and OCPA claims).  Thus, and as further explained in Distributors' *Summit County* reply, the Funds' OCPA claim likewise should be dismissed for failure to plead a direct injury.  Summit Reply, Dkt. 744 at Part I.B.2.

### B. The Funds Fail To Allege an Injury to Business or Property.

A RICO plaintiff must allege that it was "'injured in [its] business or property' … to state a claim for a civil RICO damages action."  *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556, 562 (6th Cir. 2013) (en banc) (quoting 18 U.S.C. § 1964(c)).  The Funds fail to allege an injury to "business or property" because their alleged injuries are entirely derivative of ***personal*** injuries—a class of injuries not actionable under RICO.

- 8 -

The Sixth Circuit's *en banc* decision in *Jackson* embraced this principle and is controlling. There, the plaintiffs alleged that defendants were participants in a scheme to deny workers' compensation benefits to employees who suffered on-the-job injuries.  *Jackson*, 731 F.3d at 558. The Court rejected the argument that the plaintiffs' economic injuries, i.e., the loss of their workers' compensation benefits, constituted an injury to "business or property," holding that "both personal injuries and ***pecuniary losses flowing from those personal injuries*** fail to confer relief under [RICO]."  *Id.* at 565–66.  Because the plaintiffs' pecuniary losses were "a consequence of their personal injuries," those losses did not give plaintiffs a basis to sue under RICO.  *Id.* at 566.

*Jackson* compels the same result here.  The Funds' medical expenditures flow entirely from the personal injuries of their members.  Under Sixth Circuit precedent, because such damages "flow from" personal injuries, they are not injuries to "business or property" for purposes of RICO. *Id.* at 565–66; *see also* Summit Br., Dkt. 491-1 at Part I.A.1 (collecting cases).

### C.     The Funds Fail To Allege Predicate Acts by Distributors.

The RICO and OCPA claims should be dismissed because the Complaint fails adequately to allege that any Distributor committed two or more predicate acts of racketeering or (in the parlance of the OCPA) corrupt activities.  The Funds allege as predicate acts that Distributors committed (1) mail and wire fraud and (2) violations of the CSA.  Compl. ¶¶ 942–43.  Plaintiffs' allegations of mail and wire fraud are identical to those of Summit County and fail for the same reasons.  *See* Summit Br., Dkt. 491-1 at Part I.C; Summit Reply, Dkt. 744 at Part I.C.  Moreover, as explained in Distributor's *Summit County* brief, violations of 21 U.S.C. §§ 823 or 843(a)(4) do not constitute predicate acts under RICO or corrupt activity under the OCPA.  *See* Summit Br., Dkt. 491-1 at Part I.C; Summit Reply, Dkt. 744 at Part I.C.  The Funds' RICO claims against Distributors therefore should be dismissed.

The Funds' OCPA claim also fails because the Complaint does not allege "at least one incident other than a violation of" the federal mail and wire fraud statutes. *See* Ohio Rev. Code § 2923.34(A)). As explained in Distributors' *Summit County* reply, the factual basis for the Funds' Ohio telecommunications fraud claim is identical to the factual basis for its federal mail and wire fraud claims, which fails to satisfy the requirements of Section 2923.34(A). *See* Summit Reply, Dkt. 744 at Part I.C.2.

### D.    The Funds' Enterprise Allegations Fail.

The Funds' RICO enterprise allegations fail because the Complaint does not allege a RICO enterprise in which Distributors participated, let alone one whose affairs they directed.

In order to plead the existence of an enterprise, a plaintiff must allege (1) a shared "purpose" and (2) "relationships among those associated with the enterprise." *Boyle v. United States*, 556 U.S. 938, 946 (2009). In addition, a plaintiff must allege with particularity that each defendant played "some part in ***directing*** the enterprise's affairs." *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008); *accord Bradley v. Miller*, 96 F. Supp. 3d 753, 773 (S.D. Ohio 2015) (applying similar requirement to OCPA claim). The Funds' allegations against Distributors satisfy none of these requirements.

While the Complaint alleges that the Manufacturers conspired with one another to increase the demand for opioids, *e.g.*, Compl. ¶ 840, it does not allege that Distributors did so. The Complaint also alleges that the "Supply Chain Defendants" conspired together "for the purpose of increasing the quota" set by DEA for prescription opioids, Compl. ¶ 934, but that allegation is both conclusory and implausible. Manufacturers, not Distributors, submit the quota applications referenced in the Complaint, because the quota governs the amount of opioid medications that can

be manufactured.[9]  Lastly, the Complaint alleges that Distributors sought to increase their profits by distributing an "increased volume of opioid[s]," *id.*, but allegations of parallel, profit-seeking activity among competitors is insufficient to establish the existence of a RICO enterprise.  *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655-56 (7th Cir. 2015) (distinguishing between "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest"); *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1352 n.3 (11th Cir. 2016) (noting that because "making money is the purpose of every for-profit corporation," a mere commercial relationship to make profits "is wholly insufficient to establish an association-in-fact enterprise").

The Funds also fail to identify the requisite relationship among the purported members of the alleged enterprise.  The Complaint does little more than point to the fact that Distributors share a trade association.  *E.g.*, Compl. ¶ 935.  But that does not give rise to a RICO claim.  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010) ("[P]articipation in trade organizations provides no indication of conspiracy."); *Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127, 142 (S.D.N.Y. 2014) ("[M]embership in a trade association hardly renders plausible the conclusion that ... members are functioning as an ongoing, organized, structured [RICO] enterprise."), *aff'd in relevant part sub nom. Babb v. Capitalsource, Inc.*, 855 F. App'x 66, 68 (2d Cir. 2015).  Nor does the fact that Distributors allegedly had contractual relationships with the Marketing Defendants give rise to a RICO claim.  *Robins v. Global Fitness Holdings, LLC*, 838 F.

---

[9]  21 C.F.R. §§ 1303.21-.23; *see generally* Drug Enf't Admin, *Quota Applications*, https://www.deadiversion.usdoj.gov/quotas/quota_apps.htm.  DEA receives public comment before setting the annual quota.  If Distributors had taken a position about the quota, it would be a simple matter for the Funds to allege that fact.  But the Complaint alleges no facts to support the contention that Distributors acted to increase the quota in any year.

Supp. 2d 631, 653 (N.D. Ohio 2012) (Polster, J.) ("[R]outine business relationships, without more, are insufficient to establish a RICO claim.").[10]

Finally, the Complaint is entirely devoid of well-pled factual allegations relating to the conduct of each Distributor that, if true, would support the bare assertion that Distributors "ma[de] decisions on behalf of" an association-in-fact enterprise or "knowingly carr[ied] them out." *Fowler*, 535 F.3d at 418; *see* Summit Br., Dkt. 491-1 at Part I.D.  For all these reasons, the enterprise allegations fail as a matter of law.

### III.     THE FUNDS' NUISANCE CLAIMS SHOULD BE DISMISSED.

The Funds' public nuisance claims mirror, almost verbatim, the public nuisance claims asserted by Summit County.  Thus, the Funds' claims fail for following reasons:

- The 2007 Amendment to the Ohio Products Liability Act ("OPLA") bars the Funds' absolute and statutory public nuisance claims, *see* Summit Br., Dkt. 491-1 at Part II.A;

- The Funds fail to allege interference with a public right, *id.* at Part II.B.1;

- Licensed persons, like Distributors, that engage in highly-regulated conduct cannot be liable under an absolute (as opposed to qualified) public nuisance theory, especially absent intentional conduct, *id.* at Part II.B.2; and

- The Funds lacks authority to bring a statutory public nuisance claim premised on alleged violations of the Ohio Dangerous Drug Act or the federal CSA, *id.* at Part II.C.

The Funds' absolute public nuisance claim also fails for another reason.  As explained above, Plaintiffs' injuries are derivative of the personal injuries suffered by the Funds' members.

---

[10]     *See also Bonadio v. PHH Mortg. Corp.*, No. 12 CV 3421(VB), 2014 WL 522784, at *3 (S.D.N.Y. Jan. 31, 2014) (dismissing RICO claim where plaintiff's "only factual allegations relating to the enterprise are that its members had ongoing business relationships"); *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1092 (N.D. Cal. 2006) (enterprise allegations insufficient where based "upon the existence of routine contractual relationships").

Accordingly, the Funds lack standing to pursue a public nuisance claim under Ohio law. *See Miller v. W. Carrollton*, 632 N.E.2d 582, 585–86 (Ohio Ct. App. 1993) ("[T]he general rule is that a private individual lacks standing to maintain a private action … [unless] he has suffered some special injury or particular damage not incurred by the public generally"); *see also Thompson v. Argent Mortg. Co. LLC*, No. 94613, 2010 WL 3747601, at *3 (Ohio Ct. App. Sept. 23, 2010) ("These concerns, while serious, are not ones that plague Thompson any more than they do the community in which she lives.").

In seeking to recover for the medical costs of its members, the Funds are situated similarly to West Boca Medical Center, which seeks to recover the costs of the medical care it provided to opioid-impacted patients. Because the law concerning a private plaintiff's ability to bring common law public nuisance claims in Ohio is the same as in Florida (and virtually every other jurisdiction), the Funds' public nuisance claims fail for the same reasons that West Boca Medical Center's claims fail. *See* West Boca Br., Dkt. 684-1 at Part III.

## IV.    THE FUNDS' NEGLIGENCE CLAIM SHOULD BE DISMISSED.

The Funds' negligence claim should be dismissed because it is abrogated by the OPLA and because the Complaint fails adequately to identify any duty that Distributors owe to the Funds or any breach by Distributors.

### A.    The OPLA Bars the Negligence Claim.

The OPLA expressly "abrogate[s] ***all common law product liability claims or causes of action***." Ohio Rev. Code § 2307.71(B). The Funds' negligence claim even more clearly comes within the OPLA's ambit than does Summit County's negligence claim. First, the County sought damages for its expenditures on medical costs, plus other costs, but the Funds seek to recover medical costs alone. *See* Summit Br., Dkt. 491-1 at Part III.A. Second, the Funds allege that Defendants' breach of "applicable standards of conduct in manufacturing, advertising, marketing,

selling and/or distributing opioids," caused Fund members to suffer "addiction, abuse, overdose and death," along with emergency room visits, Hepatitis C, and HIV.  Compl. ¶¶ 20, 1063.  These allegations track the language of the OPLA's definition of a "product liability claim," i.e., injuries that arise from the "design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing" of a product.  Ohio Rev. Code § 2307.71(A)(13).  This Court and others routinely have dismissed common law negligence claims that sound in product liability.  Summit Br., Dkt. 491-1 at Part III.A; *see id.* at p. 33 n.24 (collecting cases).  The fact that the Funds seek only economic damages does not exempt their negligence claim from the OPLA.  Summit Reply, Dkt. 744 at Part III.A.[11]

**B.     The Complaint Fails To Allege a Duty Owed by Distributors to the Funds.**

It would be futile for the Funds to amend the Complaint to allege a statutory negligence claim under the OPLA.  That is because the alleged negligence is grounded in a duty to monitor and report suspicious pharmacy orders that is the exclusive creation of federal and state regulations.  That duty runs solely to the DEA and the Board of Pharmacy ("BOP"), which have exclusive authority to enforce it.  The case law is clear that there is no private right of action.  Thus, only if there is a pre-existing and parallel common-law duty to report or halt shipment of suspicious orders can the Funds sue in negligence.  But no court has recognized such a duty under the common law of Ohio.  As such, the Funds' negligence claim is an improper attempt to circumvent the prohibition against private rights of action under the Controlled Substances Act ("CSA"), 21

---

[11]     While a plaintiff who asserts a common law claim that has been abrogated by the OPLA is typically given the opportunity to re-plead under the OPLA, the Funds' claims should be dismissed *with prejudice* because of the other defects identified herein.  *See* Summit Br., Dkt. 491-1 at Part III.A.

C.F.R. § 1301.74(b), and Ohio Admin. Code 4729-9-16(H).  *See* Summit Br., Dkt. 491-1 at Part III.B; Summit Reply, Dkt. 744 at Part III.B.

### 1.  No private right of action

As explained in Distributors' *Summit County* brief, there is no private right of action to enforce the statutes and regulations identified in the Complaint.  *See* Summit Br., Dkt. 491-1 at Part III.B.1.  And permitting a plaintiff to enforce statutory or regulatory duties through common-law negligence, the Sixth Circuit has recognized, "would, in effect, be permitting a private cause of action under" the statute or regulation.  *Myers v. United States*, 17 F.3d 890, 901 (6th Cir. 1994); *see* Summit Br., Dkt. 491-1 at Part III.B.1 (collecting cases).  In short, a plaintiff cannot plead around the prohibition on private rights of action; rather, a plaintiff can pursue a negligence claim only if it can identify a preexisting common-law duty that mirrors one or more of the statutory and regulatory duties.  Not surprisingly, the Funds do not do that, because the duties they assert were the unique creation of Congress and DEA as part of a comprehensive regulatory scheme (from which the Ohio General Assembly borrowed).

### 2.  No common law duty

The gravamen of the Complaint is that Distributors had a duty to monitor pharmacy orders and to report or halt apparently suspicious orders.  Compl. ¶¶ 1064, 1067, 1070–73, 1080.  As explained above, to the extent those duties exist, they are creatures of statute, with no grounding in the common law.  *See* Summit Br., Dkt. 491-1 at Part III.B.3.

If such duties did exist at common law, the Funds' negligence claims still would fail, because those reporting and monitoring duties were not owed *to Plaintiffs.*

First, as a matter of law, duty refers to "the relationship *between the plaintiff and the defendant* from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff."  *Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1026 (Ohio 2002); *see*

*Bohme, Inc. v. Sprint Int'l Commc'ns Corp.*, 686 N.E.2d 300, 303 (Ohio Ct. App. 1996) (the existence of a duty "depends upon the relationship between the parties").  Any duty to report suspicious orders runs to DEA and the BOP, not to private parties that lack the authority to investigate.  Because there was and is ***no relationship*** between the Funds and Distributors, there can be no general duty owed to the Funds to monitor what happens after Distributors supply their pharmacy customers.  The Funds have a relationship with their members and, the members, with their doctors and pharmacies. But neither the Funds nor their members deal with Distributors. Distributors do not even know who purchases the drugs that their pharmacy-customers dispense. When they inspect their pharmacy-customers, HIPAA prevents Distributors from seeing patient-specific information.[12]

Second, generally there is "no duty to prevent a third person from causing harm to another absent a special relation[ship] between the parties."  *Simpson v. Big Bear Stores Co.*, 652 N.E.2d 702, 705 (Ohio 1995) (citing Restatement (Second) of Torts § 315 (1965)).  The Funds cannot plausibly allege any such special relationship with Distributors.  They cannot allege that Distributors had any relationship with the doctors who prescribed the medications or the patients who used them.  And the only relationship Distributors had with the pharmacies that dispensed the medication was an arms-length, buyer-seller relationship.  Accordingly, Distributors have no common-law duty to the Funds to monitor, report, or prevent downstream diversion of prescription opioids after the medications have been shipped or to control those whose conduct has allegedly injured the Funds.  *See Labzda*, 292 F. Supp. 2d at 1355 (citing *Swayze v. McNeil Labs., Inc.*, 807

---

[12]  Absent a business relationship, a duty to disclose can exist where there is a "special" relationship of some kind between the parties, such as a fiduciary relationship.  None is alleged here.

F.2d 464, 472 (5th Cir. 1987)) (drug manufacturer had no common law duty to control physicians prescribing its drugs).

Finally, the diversion of opioid medications (i.e., the transfer of the medications to someone not authorized to use them)—whether by doctors who mis-prescribe them, patients who sell them or give them away, or traffickers who deal in them—involves illegal or, at the very least, intentional conduct.  It constitutes a superseding cause that cuts off any duty Distributors can be said to have owed to the Funds.  Under Ohio law, "there is no common-law duty to anticipate or foresee criminal activity.  Thus, *the law usually does not require the prudent person to expect the criminal activity of others*…."  *Feichtner v. Ohio Dep't of Transp.*, 683 N.E.2d 112, 119–20 (Ohio Ct. App. 1995) (quoting *Fed. Steel & Wire Corp. v. Ruhin Constr. Co.*, 543 N.E.2d 769, 772–73 (Ohio 1989)).  The same presumption holds when the intervening conduct is not illegal, but intentional: "Traditionally, an intentional tort committed by a third party constitutes an intervening act which supersedes the negligence of the party creating the risk of harm, and relieves that party from liability.… *[T]he intentional act is considered a superseding cause because such acts are typically not foreseeable.*"  *Volter v. C. Schmidt Co.*, 598 N.E.2d 35, 39 (Ohio Ct. App. 1991) (per curiam).

### 3.      No breach

Finally, the Funds' negligence claim fails because the Complaint does not properly allege facts suggesting that Distributors breached their purported duty to report and halt suspicious opioid orders.  The Complaint does not identify any pharmacy that placed excessive orders or any specific order that Distributors should have reviewed or refused to fill—let alone tie any such order to the Funds' purported injury.  For this reason, too, the negligence claim fails as a matter of law.

## V.    THE FUNDS' CLAIMS FAIL FOR ADDITIONAL REASONS.

### A.    The Funds Fail To Plead Causation.

The *Holmes* direct-injury test has been incorporated into the common law of Ohio, and it applies to all of the Funds' common law claims. *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 503 (6th Cir. 2010) (recognizing that "the Ohio Supreme Court has adopted the *Holmes* Court's proximate cause analysis"). Accordingly, for the reasons described above, the Funds' derivative and indirect injuries were not proximately cause by Distributors' conduct as a matter of law. *See supra* pp. 3–6.

To understand why the Funds cannot show that Distributors were the proximate cause of their alleged injuries, it is important to consider the circumstances under which Plaintiffs' members require opioid-related medical treatment. As was true of the personal injury plaintiffs who sued opioid manufacturers (discussed above), one of two circumstances will be the case—either the member used opioids ***licitly***, having obtained a legal and valid prescription from his or her doctor, or the member used them ***illicitly***, having obtained them other than by legitimate prescription. *See supra* pp. 5–6. In neither circumstance did Distributors cause that individual any harm at all, much less proximately.

Consider the case of an insured who became addicted from taking opioid medications that were appropriately prescribed by a doctor fully informed about the risks of opioid medications. The doctor's exercise of professional judgment is final and cuts off any liability of a distributor. That is the underlying rationale of the "learned intermediary" doctrine. *See Tracy v. Merrell Dow Pharms., Inc.*, 569 N.E.2d 875, 878–79 (Ohio 1991) (where a doctor is properly informed of the risks of a drug, a manufacturer's liability is cut off because "the manufacturer may reasonably assume that the physician will exercise his informed judgment in the patient's best interests").

- 18 -

Next, consider the case of an insured who became addicted from taking opioid medications that were mis-prescribed or over-prescribed by a doctor who relied on what the Funds allege was deceptive advertising by the Manufacturers.  Distributors were not the proximate cause of that person's harm either, much less the insurer's harm.  Reporting this or that pharmacy order as "suspicious," even halting it, would not have meant that the pharmacy would not have filled the doctor's well-intentioned prescription. Again, if the doctor was exercising his independent professional judgment in writing the prescription, that fact would cut off the liability of a distributor, which has no standing to second-guess the doctor's judgment (even if it knew for whom and why the doctor was prescribing opiates, which HIPAA prevents).  Most courts have recognized that the connection between a third-party payor's financial harm and a manufacturer's deceptive marketing is too attenuated to satisfy the proximate cause requirement.  *See, e.g.*, *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 578 (7th Cir. 2017) (applying *Holmes* proximate cause analysis and concluding that "improper representations made to physicians do not support a RICO claim by Payors, several levels removed in the causal sequence").  *A fortiori* the connection between a third-party payor's harm and Distributor's alleged conduct is far too attenuated, as the Funds do not allege that Distributors participated in the purported deceptive advertising campaign.[13]

---

[13]  The Funds do allege, in conclusory fashion, that all Defendants affected the Funds' purchasing decisions because, by "illegally suppress[ing] evidence of diversion," Defendants affected the decisions of third party administrators ("TPAs") and pharmacy benefit managers ("PBMs") regarding what drugs would be covered.  Compl. ¶ 761.  This allegation is implausible as to Distributors, whose alleged duty was to report suspicious orders.  *See id.* ¶¶ 469–83, 485–86. When they complied with that alleged duty, the reports went to DEA and the BOP, not the TPAs and PBMs, and a party cannot rely on information it does not know.  If Distributors failed to comply, the Funds were no worse off.  In either event, the fact that opioid prescriptions and opioid use were rising was no secret to TPAs and PBMs, which could see it from their own data.

Lastly, consider the case of an insured who has been injured by his own illicit opioid use. Distributors are not the actual cause of the harm to the Funds stemming from that use, as the Distributors lack the capacity to prevent an individual with whom they have no relationship from engaging in criminal activity to secure opioids illegally.  Distributors do not proximately cause those injuries, either, because of the principle that "superseding criminal misconduct of actors outside [defendants'] control" breaks the causal chain.  Summit Br., Dkt. 491-1 at Part IV.C; *see also White v. Vrable*, No. 98AP-1351, 1999 WL 771053, at *5 (Ohio Ct. App. Sept. 30, 1999); *Bilicic v. Brake*, 581 N.E.2d 586, 587–88 (Ohio Ct. App. 1989).  Were it otherwise, then Distributors would be in the untenable situation of being legally responsible for protecting the Funds from the financial consequences of ***their own members'*** criminal actions.  No theory of causation would justify such a result.

## B.      The Economic Loss Doctrine Bars the Funds' Claims.

The Funds allege that their injuries are economic; assuming that assertion is true, the Ohio economic loss doctrine bars them.  The doctrine "bars tort plaintiffs from recovering purely economic loss that does not arise from tangible physical injury to persons or property."  *City of Cincinnati v. Deutsche Bank Nat'l Trust Co.,* 863 F.3d 474, 477 (6th Cir. 2017) (quoting *Queen City Terminals, Inc, v. Gen. Am. Transp. Corp.*, 653 N.E.2d 661, 667 (Ohio 1995)); *see also* Summit Br., Dkt. 491-1 at Part IV.A (collecting cases).  The doctrine applies with equal force to negligence claims and nuisance claims.  *See RWP, Inc. v. Fabrizi Trucking & Paving Co.,* No. 87382, 2006 WL 2777159, at *4 (Ohio Ct. App. Sept. 28, 2006).

According to the Funds, they do not seek recovery for any physical injury to their members. The negligence count seeks only "economic damages" for "expenditures for special programs" and for "non-physical" and "proprietary" damages.  *See* Compl. ¶¶ 1085–86, 1089.  The Funds

allege the same harms in their nuisance count.  *See id.* ¶¶ 1046–47, 1051.  The economic loss rule therefore bars the negligence and nuisance claims.

For these reasons, as well as the addition reasons set forth in Distributors' *Summit County* reply, the economic loss doctrine bars the Funds' common law claims.  *See* Summit Reply, Dkt. 744 at Part V.

## VI.    THE FUNDS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

The Funds allege that they conferred a benefit on Distributors by "paying for Defendants' externalities" in the form of "healthcare services and treatment services to people who use opioids," and that Distributors benefited because the payments ostensibly "allowed [Distributors] to continue providing customers with a high volume of opioid[s]."  Compl. ¶¶ 1136, 1134, 1138. These allegations do not plead an unjust enrichment claim for several reasons.

First, the Funds' claim fails because there has been no "economic transaction" between the parties.  *Ohio Edison Co. v. Direct Energy Bus., LLC*, No. 5:17-cv-746, 2017 WL 3174347, at *3 (N.D. Ohio July 26, 2017) (quoting *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Enters., Inc.*, 50 N.E.3d 955, 967 (Ohio Ct. App. 2015)).  Indeed, the Funds do not allege ***any*** relationship, business or otherwise, with Distributors.  For substantially the reasons explained in Distributors' *Summit County* brief, the absence of an economic transaction involving Distributors and the Funds is fatal to the unjust enrichment claim.  *See* Summit Br., Dkt. 491-1 at Part V.

Second, allegations that a plaintiff paid for a defendant's externalities cannot provide the necessary foundation for an unjust enrichment claim.  Virtually every enterprise generates externalities.  For example, the "food industry puts refined sugar in many products, making them more tasty; as a result some people eat too much (or eat the wrong things) and suffer health problems and early death."  *Local 734*, 196 F.3d at 823.  As the Seventh Circuit explained, however, these externalities do not give rise to a claim on behalf of health insurers who have to

pay increased costs of care.  *Id.*  Unless a party has an independent legal obligation to pay for its externalities, the party receives no legally-cognizable benefit when someone else pays for them.  *See, e.g.*, *Local 734*, 196 F.3d at 823 ("A third-party payor has no claim if its insured did not suffer a tort; no rule of law requires persons whose acts cause harm to cover all of the costs, unless these acts were legal wrongs.").  This is especially so when, as here, the payors (i.e., the Funds) have an independent, contractual obligation to make the payments.  *Seafarers Welfare Plan v. Philip Morris*, 27 F. Supp. 2d 623, 635 (D. Md. 1998) ("The Plaintiffs paid the smoking-related medical costs of their participants because they were legally obligated by contract to do so.  Thus, the expenses that they incurred were at the behest of their participants.  The Plaintiff Funds did not confer a benefit on the Defendants.").

Third, where (as here) a plaintiff's injuries are too remote and derivative to state a tort claim against the defendant, a tag-along claim for unjust enrichment should likewise be dismissed.  *See, e.g.*, *Steamfitters Local Union No. 420 Welfare Fund*, 171 F.3d at 937 ("We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from defendants' wrongdoing."); *Tex. Carpenters Health Benefit Fund v. Philip Morris, Inc.*, 21 F. Supp. 2d 664, 678 (E.D. Tex. 1998) ("The Court finds that payment of the Participants' medical expenses did not enrich [the defendants]….  Any other such benefit that the Funds attempt to claim inured to [the defendants'] benefit is too indirect, remote and speculative to support recovery under this theory."), *aff'd*, 199 F.3d 788 (5th Cir. 2000).

Finally, even assuming the Funds somehow conferred a benefit on Distributors, there is no injustice to be remedied.  The raison d'être of the Funds (and all health insurance) is to pay for its member/policyholder's medical costs in exchange for premium payments.  Compl. ¶¶ 28–29, 682.

There is nothing unjust about the Plaintiffs' reimbursement of those costs when they have collected premiums for just that eventuality.  *See* Summit Br., Dkt. 491-1 at Part V.

## VII.    THE FUNDS' CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED.

The Funds' civil conspiracy claim fails for the same reasons that Summit County's civil conspiracy claim failed.  *See* Summit Br., Dkt. 491-1 at Part VI.

### CONCLUSION

For the foregoing reasons, the Funds' claims should be dismissed with prejudice.

Dated:  July 23, 2018                                                   Respectfully submitted,


*/s/ Robert A. Nicholas*                                      */s/ Enu Mainigi*
Robert A. Nicholas                                           Enu Mainigi
Shannon E. McClure                                         F. Lane Heard III
**REED SMITH LLP**                                         Steven M. Pyser
Three Logan Square                                          Ashley W. Hardin
1717 Arch Street, Suite 3100                           **WILLIAMS & CONNOLLY LLP**
Philadelphia, PA 19103                                     725 Twelfth Street, N.W.
Tel: (215) 851-8100                                          Washington, DC 20005
Fax: (215) 851-1420                                         Tel: (202) 434-5000
rnicholas@reedsmith.com                              Fax: (202) 434-5029
smcclure@reedsmith.com                              emainigi@wc.com
                                                                       lheard@wc.com
*Counsel for AmerisourceBergen Corporation*     spyser@wc.com
*and AmerisourceBergen Drug Corporation*        ahardin@wc.com

                                                                       *Counsel for Cardinal Health, Inc.*

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
Mark H. Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Case Management Orders 1 (Dkt. 232) and 4 (Dkt. 485), which adopt the

limits on length of memoranda applicable to complex cases, Distributors are permitted to file a

memorandum of up to 30 pages.  This brief adheres to that limit.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart


## CERTIFICATE OF SERVICE

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart